IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NICHOLAS L. REICH d/b/a
REICH'S ROADHOUSE LLC,

                    Plaintiff,                         OPINION AND ORDER

    v.

                                               19-cv-763-wmc

AUTO-OWNERS INSURANCE
COMPANY,

                    Defendant.

In August of 2018, an explosion and fire severely damaged two buildings owned by Nicholas Reich, doing business as Reich's Roadhouse, LLC. Along with the buildings, defendant Auto-Owners Insurance Company ("Owners"), had insured the fixtures and personal property contained in those buildings. After ultimately resolving their dispute over coverage on damage to the buildings themselves (dkt. #52), Reich still has an outstanding claim for loss of $14,325 in cash, approximately $200,000 for business personal property ("BPP"), and approximately $30,000 for electronic data processing equipment ("EDP"). To date, Owners has denied Reich's claim for lost cash under an exclusion in the Policy. As to the claims for lost BPP and EDP, Owners provided a $100,000 "advance," but refused to pay any more on the grounds that Reich had not produced sufficient supporting documentation.

Based on these and other coverage disputes since resolved by the parties, plaintiff Reich brought this lawsuit for breach of an insurance contract for failure to pay and bad

faith.[1]  Presently before the court is plaintiff's renewed, partial motion for summary judgment as to his remaining claims for loss of money, BPP, and EDP, plus interest.  (Dkt. #19.)  For its part, defendant seeks partial summary judgment as to plaintiff's remaining bad faith claim.  (Dkt. #53.)  For the reasons discussed below, the court will grant plaintiff's motion in part and grant defendant's motion in full.[2]

## UNDISPUTED FACTS[3]

### A. Explosion and Fire

Reich's Roadhouse was a bar, restaurant and bowling alley owned and operated by plaintiff Nicholas Reich.  On August 7, 2018, an accidental explosion and subsequent fire occurred at the Roadhouse, severely damaging the two buildings located on the property.  Those buildings, along with fixtures and specified personal property, were insured by Owners under the terms of an tailored protection insurance policy ("the Policy").  (Dkt. #23-1.)

[1] This case originated in state court, but was removed by defendant.  (Dkt. #1.)  This court has jurisdiction under 28 U.S.C. § 1332 as plaintiff is a Wisconsin citizen, defendant is a Michigan corporation with its principal place of business in Michigan, and the amount in controversy exceeds $75,000.  (Dkt. #1.)  Additionally, plaintiff initially claimed that Owners had improperly failed to agree to appraisal of one of the covered buildings, but the parties have since notified the court that they have reached a partial settlement as to the issue of coverage of the building.  (*See* dkt. #52.)

[2] Also before the court is plaintiff's motion to substitute its responses to defendant's proposed findings of fact.  (Dkt. #61.)  Filed only one day after the original deadline, this motion was accompanied by the corrected responses, and is unopposed by defendant.  Accordingly, the court will also grant it.

[3] These material and undisputed facts are drawn from the parties' proposed findings and supporting evidence for purposes of summary judgment, unless otherwise indicated.  Of course, these facts and other disputed facts will be viewed in the light most favorable to the party opposing summary judgment on that claim.

**B. The Policy**

Particularly relevant here, the Policy contains a general "Building and Personal Property Coverage Form" which defines certain covered property and various other terms and conditions.  (*Id.* at 59-72.)  One of the sections of this form is titled "Loss Conditions," which contains an appraisal clause that states in relevant part:

> If we and you disagree on the value of the property or the amount of the loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the value of the property and amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding. Each party will:
> a.  Pay its chosen appraiser; and
> b.  Bear the other expenses of the appraisal and umpire equally.
> If there is an appraisal, we still retain our right to deny the claim.

(*Id.* at 67.)

The Loss Conditions section also imposes certain, specific duties on the insured in the event of a covered loss or damage, including in relevant part:

> (5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, cost values and amount of loss claimed.
> (6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.
> (7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.
> (8) Cooperate with us in the investigation or settlement of the claim.

(*Id.* at 67.)

In the event of a claim, Owners also retains the right under the Policy to:

> examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records.  In the event of an examination, an insured's answers must be signed.

(*Id.*)  At the same time, the Policy obligates Owners to:

> pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and: (1) We have reached agreement with you on the amount of loss; or (2) An appraisal award has been made.

(*Id.* at 68.)  The value of the lost or damaged property is the "actual cash value as of the time of loss or damage," (with some exceptions not applicable here).  (*Id.* at 69.)

The Building and Personal Property Coverage Form extends coverage to certain "Business Personal Property" ("BPP").  (*Id.* at 59.)  Additionally, the Policy contains an "Electronic Data Processing Equipment" endorsement that modifies the general Building and Personal Property Coverage form, which, as the name suggests, extends coverage to loss of or damage to electronic data processing equipment ("EDP").  (*Id.* at 25-29.)

The general Building and Personal Property Coverage Form is further modified by a "Money and Securities" endorsement.  (*Id.* at 32-36.)  This endorsement states that Owners (referred to as "we" in the form) will cover losses of money and securities "inside the premises."  Specifically, the endorsement states that:

> (1) We will pay for loss of "money" and "securities" inside the "premises" or a "banking premises" resulting directly from:
> > (a) "Theft"; or
> > (b) Disappearance or destruction

> (2) We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities" if you are the owner of the "premises" or are liable for damage to it.
>
> (3) We will pay for loss of, and loss from damage to, a locked safe, vault, cash register, cash box or cash drawer located in the "premises" resulting directly from an actual or attempted:
>
> > (a) "Theft" of; or
> >
> > (b) Unlawful entry into those containers.

(*Id.* at 32.)  That endorsement then goes on to list a number of exclusions, the most relevant being that Owners

> will not pay for loss caused by any of the following:
> . . .
> e. Fire: Loss from damage to the "premises" resulting from fire, however caused.

(*Id.*)  The endorsement defines "premises" as "the interior of that portion of any building you occupy in conducting your business."  (*Id.* at 36.)

Finally, the declarations page to the form and endorsements establishes the following coverage limits:  Electronic Data Processing Equipment, $100,000; Money and Securities Inside Premises, $50,000; Personal Property, $140,610.  (*Id.* at 10-12.)

## C.  Facts Relating to Plaintiff's Claim for Loss of BPP and EDP

After the loss, Reich hired Globe Midwest Adjusters International ("Globe") to serve as his Public Adjuster in relation to the claim for damages to Reich's Roadhouse.  Jason Martell was the Globe employee primarily responsible for handling Reich's claim and he was also the primary point of contact between Globe and Owners.  On September 13, 2018, Reich through Martell submitted a sworn proof of loss form, which included the following:

| Coverage Involved | Replacement Cost of Damage | Actual Cash Value of Damage | Total Insurance Under this Policy | Amount Claimed Under this Policy |
|---|---|---|---|---|
| Building 001 | $850,000 | $550,000 | 325,600 | $325,600 |
| Building 002 | Included above | $100,000 | $87,100 | $87,100 |
| Business Personal Property | $250,000 | unknown | $140,610 | $140,610 |
| Loss of Business Income | $55,000 | unknown | unknown | $55,000 |
| Inflation Guard | unknown | unknown | unknown | unknown |
| TOTALS | $1,055,000+ | unknown | $608,310+ | $608,310+ |

(Martell Decl., Ex. A (dkt. #10-1) 1.)

On January 8, 2019, Reich (again through Martell) further submitted to Owners a 216-page document prepared by Globe and titled "BPP Loss Summary." (*See* Second Martell Decl., Ex. B (dkt. #23-2).) That document claims a replacement value on lost BPP of $231,534.37 and an actual cash value of $198,922.93. (*Id.* at 2.) Additionally, that document claims that the EDP lost had a replacement value of $35,373.57 and an actual cash value of $30,862.52. (*Id.*) An itemized list of each claimed piece of property then followed, including a description, quantity, unit cost, total cost, and "documentation," which generally states either "internet" or "per insured." (*Id.*) A separate itemized list of EDP was also included, providing this same information. Finally, the document contains various print-outs from internet websites of items and their costs. For example:

6



San Jamar H4005TBK Venue Tabletop Fullfold Napkin Dispenser

★ ★ ★ ★ ★  Item #: 712H4005T BK    MFR #: H4005TBK

Only
**$21.99**/Each
Ships free with

(*Id.* at 12.)

In response to this claim, Owners Representative T.J. Scheff promptly sent Martell an email on January 10, 2019, requesting "the ages of the items being claimed." (Second Martell Decl. (dkt. #23) ¶8.) And almost equally prompting, six days later, Martell provided Scheff with a new version of the document with ages of the items hand-written by Reich in an additional column.

At that point, however, progress slowed considerably. Almost nine weeks later, on March 20, 2019, Owners sent Reich a follow-up letter, while confirming receipt of the additional information regarding the ages of the items (as had been requested), then continued:

> We noted that in your 2017 tax returns, you claimed that your BPP was worth $7,465 and was purchased for $30,829. The documentation you submitted to us[] indicates that you had BPP of $299,977.95 with an ACV of $257,894.96. While most of the items you claimed were not included in your tax documentation, of those that were, we found that the ages you

> submitted to us were inconsistent with that you had previous
> reported.

(Second Martell Decl., Ex. 4 (dkt. #23-4) 1-2.)  Owners further attached a "BPP Variation Spreadsheet" in which it noted the age and cost discrepancies of other specific items included in Reich's 2017 tax returns and the BPP Loss Summary provided to Owners.

Overall, the items listed by Owners in the BPP Variation Spreadsheet resulted in a total discrepancy of $44,242.05 when taking the difference between:  (1) the cost of the items identified in the 2017 tax returns; and (2) the cost for the same items identified in Reich's BPP Loss Summary.  Just by way of two examples, the BPP Variation spreadsheet noted that:  (1) in Reich's 2017 tax return, the "Foosball Table" was listed as 8 years old with a cost of $1,200, but in the documentation to Owners it was listed as 4 years old with a cost of $2,549.99 (*id.* at 5); and (2) an ATM, which the parties agree would qualify as covered EDP, costing $3,300 in Reich's 2017 tax return, was now listed at $4,999 in the BPP Loss Summary.

Even so, Owners "extend[ed] an advance for the BPP in the amount of $100,000," while explaining that "[b]efore we can consider any further payment, we are requesting that a full explanation of the above outlined inconsistencies and supporting documentation be submitted to us by no later than April 19, 2019."  (*Id.* at 2.)

Responding on behalf of Reich a month later via letter dated on April 19, 2019, Martell explained that the 2017 tax returns reflected the ages and cost of the items when the business was purchased in 2006-2007 and did not take into account that most of the items "have been replaced at least once since their purchase of the business."  (Third Martell Decl., Ex. A (dkt. #31-1) 1.)  Martell further explained that "[t]he insureds don't

8

have an explanation for why their accountant didn't update the depreciation schedule accordingly, but they are extremely disappointed that they did not catch the discrepancies sooner." (*Id.* at 2.)  Additionally, according to Martell:

> The cost differential between costs shown on the depreciation schedule and the Replacement Cost Values claimed on the total loss BPP inventory, as shown on your BPP Variation spreadsheet, should not be a factor in determining the value of damages suffered as a result of this claim.  The cost shown on the depreciation schedule is a book entry amount at the time the insured acquired the business, and NOT the Replacement Cost Value. The book entry amount on the depreciation schedule have absolutely NO impact on what it costs to REPLACE those particular items today with items of Like, Kind and Quality to the ones damaged.  This is the case with each of the items listed on your BPP Variance Spreadsheet.

(*Id.*)  Martell then attached numerous pre-loss photos of the bar and the property therein, showing the items claimed in the BPP Loss Summary.  Reich made notations on each photograph to identify the items by the previously assigned item number from the BPP Loss Summary.

Owners responded three weeks later, by letter dated May 10, 2019, writing that Reich "did not address the actual cash value of the loss and the numbers involved," nor had he "provided us a full explanation of the inconsistencies between the 2017 tax returns and your claim for BPP provided on January 8, 2019." (Second Scheff Decl., Ex. D (dkt. #25-4) 1.)  Accordingly, Owners requested that Reich "provide documentation to support the ages claimed on your BPP inventory as they differ from the ages documented in your 2017 tax returns for those items listed on both." (*Id.*)  They also requested "purchase receipts or other documentation to confirm your insurable interest in the items not noted in your possession as of the end of 2017." (*Id.*)

9

When Reich did not respond to this request, Owners followed up three weeks after that by another letter dated May 30, 2019, again requesting documentation establishing the ages of the inventory, as well as purchase receipts for the BPP.  In this letter, Owners advised that "[f]ailure to cooperate in providing this information is a condition issue, results may affect this claim in its entirety."  (Second Scheff Decl., Ex. E (dkt. #25-5) 1.)  Still without a response almost a month after its second letter, Owners wrote a final letter to Reich on June 28, 2019, once again requesting the same documentation requested seven weeks before in the May 2019 letter.  (Second Scheff Decl., Ex. F (dkt. #25-6) 1.)  Even then, Reich did not respond to Owners' letters.  Instead, on August 19, 2019, Reich filed the present lawsuit against Owners in Wisconsin state court, which was later removed to this court by Owners.

Somewhat inexplicably, Reich now represents in a declaration filed in this suit that the "cost" of items identified in the 2017 tax returns "was the predepreciation cost of the particular items when purchased new."  (Second Reich Decl. (dkt. #22) ¶ 8.)  Additionally, after oral argument, and in response to this court's order, Reich has now produced a number of additional documents supporting his BPP/EDP claim.  In particular, Reich represents that he has "ordered checking account records, credit card statements, receipts, and printouts of purchases from internet retailers to substantiate the purchase of items listen in the Loss Summary" and has produced those records to defendant and to the court.  (Third Reich Decl. (dkt. #48) ¶ 12.)  He further represents that "[t]he records attached hereto are all of the records we could obtain at this time pursuant to the Court's Order. . . . There may have been additional records regarding the purchase and ownership of items,

but they were lost in the explosion." (*Id.* ¶¶ 14-15.)   Tellingly, Reich provides no comparison between any of the purchase prices of specific items reflect in these only-recently-purchased records and those prices Reich previously claimed were due under the Policy.

### D. Facts Relating to Plaintiff's Claim for Loss of Money

On September 12, 2018, Reich also made a specific claim for loss of $14,325 in cash.  (*See* Second Scheff Decl., Ex. B (dkt. #25-2) 2-3.)  Martell, Reich's adjuster, later represented in an email on September 25, 2018, that this amount represented the "Cash lost in fire."  (Second Scheff Decl., Ex. B (dkt. #25-2) 1.)  Reich also sent a follow-up email to Owners on October 24, 2018, asking about the status of his claim for the lost money and requesting payment.

By letter dated November 2, 2018, Owners denied Reich's claim for loss of money under the fire exclusion clause of the Policy, explaining that:  "As we understand the facts of the claim, cash was kept onsite for use in daily business operations.  Proceeding the fire to the dwelling, the cash was recovered, but damaged beyond recognition. . . .  We are sorry to say that Auto-Owners Insurance cannot compensate you for the cash lost in the fire, due specifically [to] the exclusion noted in Form 54219 [the Money and Securities Endorsement]."  (Second Reich Decl., Ex. 1 (dkt. #22-1) 1-3.)

OPINION

In his latest motion for partial summary judgment, plaintiff contends that he is entitled to summary judgment on his claim for breach of an insurance contract because

Owners failed to pay the amounts due under the Policy for losses of money, BPP, and EDP.[4]  In contrast, defendant Owners moved for partial summary judgment on plaintiff's additional, bad faith claim based on the same alleged failure to pay.  Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view all facts and draw all inferences in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## I.  Plaintiff's Motion for Partial Summary Judgment on Breach of Contract Claim

"Where, as here, the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim."  *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).  Under Wisconsin law, an insurance contract must be "construed to give effect to the intent of the parties as expressed in the language of the policy."  *Folkman v. Quamme*, 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857.  Language in insurance policies is interpreted "according to its

---

[4] Defendant objected to Reich's motion as an improper, second motion for summary judgment. (Def.'s Opp'n (dkt. #24) 3.)  Given plaintiff's first motion for summary judgment, the better practice would have been to seek leave from the court (although that first motion has now been withdrawn in light of the parties' settlement of that issue).  However, whether or not to consider a second summary judgment motion is "essentially a decision concerning case management," reserved for the court's discretion.  *Gordon v. Veneman*, 61 F. App'x 296, 298 (7th Cir. 2003).  Here, the motion is fully briefed, was filed before the dispositive motion deadline, and filed before the court ruled on the first partial motion.  Moreover, defendant will not suffer any undue prejudice by the court's consideration of the motion, and plaintiff's motion at least offers the possibility of resolving or refining issues for trial.  Accordingly, the court will not deny this motion simply because plaintiff failed to seek leave or previously filed a summary judgment motion on a different issue.

plain and ordinary meaning as understood by a reasonable insured," although if the language is found to be ambiguous, its meaning must favor the insured. *Preiser v. General Cas. Ins. Co.,* 2014 WI 135 ¶ 19, 360 Wis.2d 129, 857 N.W.2d 136 (citing cases).

Consistent with this guidance, the Wisconsin Supreme Court has set forth the following process for interpreting insurance contracts:

> the first issue in construing an insurance policy is to determine whether an ambiguity exists regarding the disputed coverage issue. Insurance policy language is ambiguous if it is susceptible to more than one reasonable interpretation.  If there is no ambiguity in the language of an insurance policy, it is enforced as written, without resort to rules of construction or applicable principles of case law.  If there is an ambiguous clause in an insurance policy, we will construe that clause in favor of the insured.

*Folkman*, 2003 WI 116, ¶ 13.

### A.  BPP and EDP

The bulk of the parties' remaining dispute centers on whether Owners failed to pay Reich's entire loss for BPP and EDP in violation of the Policy.  Although it is undisputed that Owners paid Reich an "advance" of $100,000 on his BPP claim, plaintiff argues that Owners should have made an additional payment.  In particular, he estimates that: (1) his BPP loss had an ACV of $198,922.93 and a RCV of $231,534.37; and (2) his EDP loss had an ACV of $30,862.52 and an RCV of $35,373.57.  Plaintiff further disputes Owners' use of his 2017 tax returns to call into question these estimates, arguing that they are not relevant to determining coverage.  Alternatively, plaintiff argues that: (1) even if Owners had a valid reason to reference the tax returns, they would only put in dispute the twelve BPP items identified in Owners' "BPP Variance Spreadsheet"; and (2) even accepting the

lower valuation of these twelve items in the returns, plaintiff's BPP claim still exceeds the BPP policy limit of $140,610.00.[5]   Finally, plaintiff argues that even setting aside the parties' dispute over the proper payment for his BPP loss, Owners breached the Policy by never making *any* payment for EDP.

For its part, Owners principally contends that whatever plaintiff's actual losses for BPP and EDP may be, Reich failed to comply with his post-loss duties under the Policy in repeatedly ignoring its requests for documentation.   In particular, despite three, written requests over a seven week period, Reich completely ignored Owners' requests for purchase receipts and other documentation to confirm his insurable interest in the items.   Indeed, Reich appears to have only fully complied with this request after being served with discovery requests in this lawsuit.   Accordingly, Owners contends that its refusal to pay any amount beyond the $100,000 preliminary amount was justified under the Policy.

Even setting aside the parties' dispute as to Reich's compliance with Owners' post-loss requests, plaintiff has yet to demonstrate that a reasonable jury must find a breach under the Policy's express terms.   Indeed, the Policy states that Owners will pay only if the insured has "complied with all of the terms of this Coverage Part **and**: (1) We have reached agreement with you on the amount of loss; or (2) An appraisal award has been made." (Policy (dkt. #23-3) 68 (emphasis added).)   The parties here obviously do *not* agree as to the amount of plaintiff's BPP and EDP loss.   Moreover, unlike their earlier dispute as to the value of the buildings, neither party has made a written demand for an appraisal of

---

[5] Thirteen items total were identified in the "BPP Variance Spreadsheet," but one of the items -- the ATM -- is an item of EDP.

those losses as allowed under the Building and Personal Property Form, and so no appraisal award has been made.  Apparently this is because Reich has no interest in leaving this dispute to an appraisal process, and Owners maintains that an appraisal is not appropriate until the parties can agree on what items are to be appraised.  Regardless, disputed issues of material fact prevent the court from finding that Owners is obligated to pay any further under the express terms of the Policy.

While the express terms may not support a finding of breach, both parties' actions appear to run counter to their respective duties of good faith to each other in the performance of the contract.  *See Metro. Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 35, 291 Wis. 2d 393, 414, 717 N.W.2d 58, 69 ("Parties to a contract have a duty of good faith to each other."); *Ekstrom v. State*, 45 Wis.2d 218, 222, 172 N.W.2d 660 (1969) ("Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties."); *Chayka v. Santini*, 47 Wis.2d 102, 108, 176 N.W.2d 561 (1970) ("The duty of good faith is an implied condition in every contract."). Significantly, "a party may be liable for breach of the implied contractual covenant of good faith even though all the terms of the written agreement may have been fulfilled." *Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 796, 541 N.W.2d 203 (Ct. App. 1995); Wis. JI -- Civil 3044 ("A contracting party can breach the duty of good faith even if (he) (she) did not violate any express term of the contract.").  This duty is "not amenable to precise definition," but it has been said that "contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Bank of New York Mellon v. Brozek*, 2020 WI App

55, ¶ 11, 948 N.W.2d 501 (second quotation quoting *Metro. Ventures, LLC,* 2006 WI 71, ¶35, 291 Wis. 2d 393, 717 N.W.2d 58).[6]

Here, Owners could and should have been clearer in its specific requests for information from Reich -- indeed, it was only in May of 2019 -- nine months after the loss -- that it expressly requested purchase receipts.  Still, Reich's withholding of relevant documentation from Owners' (that he was ultimately able to produce during this litigation) is also inexplicable.  Moreover, both parties had available to them the Policy's appraisal clause, yet neither invoked it.  Thus, on these undisputed facts, it seems apparent that neither party acted in accordance with their respective duties of good faith and fair dealing.[7]

Still, an insurance company has a *heightened* duty of good faith and fair dealing to the insured under Wisconsin law, given the unique nature of the insurance relationship. *Anderson v. Cont'l Ins. Co.*, 85 Wis. 2d 675, 688, 271 N.W.2d 368, 375 (1978) ("[T]he

---

[6] The court recognizes that a claim of a breach of the duty of good faith and fair dealing and a bad faith claim may "overlap." *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 2011 WI 41, ¶ 96, 334 Wis. 2d 23, 62, 798 N.W.2d 467 (Walsh Bradley, J., concurring) ("[T]here is overlap between a breach of the implied contractual duty of good faith and fair dealing and the first element of the tort of bad faith.").  Still, the claims are distinct.  *Compare* Wis. JI -- Civil 3044 (Implied Duty of Good Faith (Performance of Contract)) *with* Wis. JI -- Civil 2761 (Bad Faith by Insurance Company).  While a claim of bad faith is an intentional tort for which punitive damages may be available, *see Anderson v. Continental Ins. Co*., 85 Wis.2d 675, 271 N.W.2d 368 (1978), a claim of a breach of good faith and fair dealing sounds in contract law and involves a lesser standard, *Foseid*, 197 Wis. 2d at 793.

[7] It should be noted that plaintiff did not specifically assert a *separate* breach of duty of good faith and fair dealing claim.  (*See* Compl. (dkt. #1-1).)  However, he did allege a breach of contract claim, and as noted in the footnote above, a breach of the duty of good faith and fair dealing sounds in contract.  *See Foseid*, 197 Wis. 2d at 793.  Moreover, although Reich is not without fault on this record, Owners has brought no claims of its own against Reich.

duty on the insurance company [has been] found to be analogous to that of a fiduciary."). Legally, as a fiduciary, Owners had an obligation to bring its impasse with Reich to resolution. Otherwise, Owners could just sit on its obligations to pay under the Policy indefinitely despite plaintiff's post-loss obligations having now been fulfilled and all of the documentation requested having now been provided, albeit only during the course of this lawsuit. Since the parties obviously *still* do not agree on a value, the Policy's appraisal clause is expressly designated as the means to resolve the parties' disagreement "on the value of the property or the amount of the loss." (Policy (dkt. #23-1) 67.)[8] Accordingly, the court will grant partial summary judgment in favor of plaintiff as to its breach of contract claim, but only to the extent of ordering an appraisal as to the value of the BPP and EDP that Owners should have already demanded.

This would appear to be the only appropriate legal or equitable course of action at this stage, now that plaintiff's post-loss obligations have been fulfilled and the parties still disagree on valuation. All other deadlines and proceedings in the present case will be stayed during the pendency of the appraisal process. If plaintiff still contends that Owners is in breach of the contract after the appraisal has been conducted, it may then revisit a claim of breach of contract or even bad faith.

### B. Money and Securities

Plaintiff next argues that Owners' failure to pay for Reich's $14,325 claim for loss

---

[8] This is especially true as plaintiff's counsel in oral argument on January 26, 2021, represented that he believed appraisal would be appropriate, and defendant's counsel likewise suggested that he would not oppose appraisal, although wished to take the depositions of Reich and his wife first.

of cash violated Owners' obligation under the Policy.  According to plaintiff, Owners improperly relied on the fire exclusion to deny his claim, arguing that the exclusion only applies to damage to the premises *themselves*, rather than to money and securities inside the premises. [9]  Owners counters that the exclusion applies to losses of "money and securities," not to losses of the "premises" themselves, and so the claim is excluded.

As the court reads the relevant portions of the "Money and Securities" endorsement, its first section discusses the types of losses and property covered, then the second section enumerates exclusions from coverage for those losses.  (*See* Policy (dkt. #23-1) 32.)  The first section contemplates coverage not just for loss of money and securities due to theft, disappearances or destruction, but also for loss from damage to the "premises or its exterior resulting directly from 'theft' of 'money' or 'securities' if you are the owner of the 'premises' or are liable for damages to it." (*Id.*)  As noted above, "premises" is defined as "the interior of that portion of any building you occupy in conducting your business." (*Id*. at 36.)  Similarly, the exclusion at issue states seemingly unambiguously that Owners will not pay for "[l]oss from damage to the 'premises' resulting from fire, however caused." (*Id.*)

The most straightforward interpretation of this exclusion is for the loss from damages to the premises themselves resulting from a fire, even if caused directly by a theft, not covered losses of money or securities.  For example, fire damage to the premises resulting from an attempted theft of money is excluded.  Otherwise, if the exclusion were

---

[9] At oral argument, plaintiff suggested that there could be another provision in the Policy that would provide for coverage for loss of "money."  In a written supplement, however, plaintiff ultimately concluded that "[b]ased on my review of the Policy there is no other provision outside of the Money and Securities Endorsement that provides such coverage."  (Pl.'s Supp. (dkt. #47) 1.)

also intended to cover money or securities lost by a fire, there would be no need to qualify the exclusion with damage to "the premises."  Such an exclusion could simply say Owners will not pay for "loss resulting from fire, however caused."  Defendant suggested at oral argument that the exclusion omits claims for money burnt by fire because the amount would be unable to be validated.  First, the endorsement unambiguously covers *all* other "destruction" of money, which presumably would be no less difficult to validate than destruction by fire, so it is not at all clear why it would exclude coverage for money destroyed in a fire, but not in other kinds of destruction.  Second, it is not the court's role to look for justifications for excluding coverage.  At best, the reach of this exclusion is ambiguous, and as previously noted, an ambiguous clause will be construed "in favor of the insured." *Folkman*, 2003 WI 116, ¶ 13.  Accordingly, the court will grant plaintiff's motion for breach of contract as to this issue, and order payment of the $14,325, plus appropriate interest due under the Policy.[10]  For the time being, however, the court will refrain from entering partial judgment under Federal Rule of Civil Procedure 54 absent a formal request by either party.

---

[10] Unlike plaintiff's claim for loss of BPP and EDP, Owners here never appears to have disputed the amount or value of the claimed lost cash.  (*See* Def.'s Resp. to Pl.'s PFOFs (dkt. #30) ¶¶ 9-14.) Thus, the basis for Owners' denial of coverage rests *only* on its misreading of the Policy.  Because the undisputed facts show that there is no reasonable disagreement over the "value of the property of the amount of loss" (again, unlike plaintiff's claim loss of BPP and EDP), appraisal as to this issue would not be appropriate, and instead an award of the undisputed amount of lost cash, plus interest, is proper.

## II.    Defendant's Motion for Partial Summary Judgment on Plaintiff's Bad Faith

The final issue to be addressed is defendant's motion for partial summary judgment on plaintiff's bad faith claim.  Two elements are required under Wisconsin law to prove a claim of bad faith against an insurer: "(1) 'a reasonable insurer under similar circumstances would [not] have denied, suspended, or delayed payment on the claim; and (2) 'the insurer knew or recklessly disregarded that there was no reasonable basis for denying benefits.'" *Dilger v. Metro. Prop. & Cas. Ins. Co.*, 2015 WI App 54, ¶ 23, 364 Wis. 2d 410, 868 N.W.2d 177 (quoting *Brown v. LIRC*, 2003 WI 142, ¶¶ 24, 26, 267 Wis.2d 31, 671 N.W.2d 279). Stated another way, "[t]o show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Anderson v. Cont'l Ins. Co.*, 85 Wis. 2d 675, 271 N.W.2d 368 (1978).  A claim that is "fairly debatable" cannot be the subject of a bad faith claim as in such a case the insurer is "entitled to debate it." *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 2011 WI 41, ¶ 26, 334 Wis. 2d 23, 798 N.W.2d 467.

Here, no reasonable fact finder could conclude that Owners acted in bad faith in considering plaintiff's claims.  As to the BPP and EDP claims, it had a reasonable basis to disagree with Reich's representations regarding the values of the items -- not only Reich's 2017 tax returns, but also other apparent inconsistencies in dates and values, which Reich declined to document despite repeated requests for information.  Although not conclusive of the value of the covered property, the returns in particular certainly entitled Owners to reconsider Reich's claimed value of BPP and EDP property.  *See Stebane Nash Co. v.*

20

*Campbellsport Mut. Ins. Co.*, 27 Wis. 2d 112, 126, 133 N.W.2d 737, 746 (1965) (where disparity of value between plaintiff's tax returns and proof of loss, tax returns not conclusive of value but could be considered as evidence in the insurance dispute).  Thus, Owners had a reasonable basis for not paying out any more on Reich's BPP and EDP loss claims pending more documentation, given Reich's own part in delaying (really, stonewalling) any further production of documents until this lawsuit.  Although the court may reconsider its ruling should Owners fail to fully cooperate and accept the results of the appraisal process, there is no basis for a reasonable jury to find bad faith against Owners to date in light of his own breach of good faith under the contract.

As to the money and securities claim, while defendant's interpretation of the exclusion is certainly weaker, it was still "fairly debatable."  The endorsement principally references coverage for "money and securities"; thus, an exclusion for loss resulting from fire could be construed to apply to money and securities.  Although for the reasons discussed above, the court concludes that plaintiff's interpretation is controlling over any arguable ambiguity, there is still no evidence that defendant knew or recklessly disregarded this.  Therefore, finding no evidence of bad faith, the court will grant defendant's motion for partial summary judgment as to this claim.

ORDER

IT IS ORDERED that:

1) Plaintiff's motion for partial summary judgment (dkt. #19) is GRANTED IN PART AND DENIED IN PART as set forth above.

2) Defendant's motion for partial summary judgment (dkt. #53) is GRANTED.

3) Plaintiff's motion to substitute its responses (dkt. #61) is GRANTED.

4) All other deadlines and proceedings, including the trial date, in the present case will be stayed during the pendency of the appraisal process. A telephonic status conference will be set for Friday, July 30, 2021, at 1:00 p.m. to confirm completion of the appraisal process and address any remaining issues; plaintiff to initiate the call to the court.

Entered this 28th day of April, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge